**In re Nicola FALOTICO, Debtor.**

**Bankruptcy No. 98–26029 NLW.**

United States Bankruptcy Court,
D. New Jersey.

March 5, 1999.

Mark Goldman, East Orange, NJ, for debtor.

Mattleman, Weinroth & Miller, Cherry Hill, NJ, for Wilshire Credit Corporation.

## OPINION

NOVALYN L. WINFIELD, Bankruptcy Judge.

This matter comes before the court, in part, by way of a motion to value real proper-

ty. The unsecured creditor, Wilshire Credit Corporation ("Wilshire") has filed a motion for relief from the automatic stay and for prospective stay relief in the event of future filings. The debtor, Nicola Falotico ("Falotico") responded with a motion to value the Wilshire secured claim at zero and to treat the claim as an unsecured claim under the Chapter 13 plan. The instant filing is the debtor's third Chapter 13 case since the mortgagee commenced foreclosure proceedings in 1994. The court concludes that the relief sought by the debtor's motion is inequitable and the relief shall not be granted. Moreover, the court finds that this case was not filed in good faith, and accordingly *sua sponte* dismisses the case under 11 U.S.C. § 1307(c).

## BACKGROUND

Wilshire did not originate the note and mortgage which gives rise to the present matter. Rather, in October, 1989, Falotico refinanced his first mortgage with First Colonial Mortgage, Inc., ("First Colonial") by borrowing the sum of $192,000 at 18.75% interest. The monthly payment of $3,196.16 did not include a component for real estate taxes. Instead, Falotico was responsible for making timely payment of real estate taxes and maintaining appropriate insurance coverage.

Wilshire asserts that since the 1989 refinance the debtor has been in default numerous times. Indeed, the history made available to the court by the parties amply supports this contention. For example, Wilshire has supplied a stipulation of settlement from December, 1991 in which Fleet Finance, Inc. agreed to dismiss its foreclosure action conditioned upon Falotico curing payment defaults.[1] Notably, the settlement also required Falotico to keep the real estate taxes current.

Counsel for Wilshire commenced a foreclosure action against Falotico's property in November, 1994. Falotico filed his first Chapter 13 petition on February 28, 1995.

However, Falotico failed to make postpetition payments to Wilshire and it obtained relief from the stay on September 28, 1995. Wilshire claims that shortly after the stay relief was granted, Falotico repeatedly told Wilshire that efforts were underway to sell the property. Nonetheless, Wilshire resumed foreclosure proceedings and a foreclosure judgment was entered on April 8, 1997. Wilshire scheduled a sheriff's sale for November 13, 1997. On November 12, one day before the scheduled sale, Falotico filed his second Chapter 13 petition, thus staying the Sheriff's sale. Falotico failed to file all of the required schedules and the second Chapter 13 case was dismissed on January 8, 1998.

After dismissal of Falotico's second Chapter 13 case, Wilshire rescheduled the foreclosure sale for April 2, 1998. Falotico apparently attempted to settle with Wilshire, even going so far as to tender $38,000 in order to postpone the scheduled sale for thirty days. Falotico also agreed to tender an additional $10,000 before the rescheduled sale date of May 6, 1998. However, Falotico did not make the $10,000 payment. Rather, he filed his third Chapter 13 petition on May 6, 1998. Since filing his third petition, Falotico has not made any payments to Wilshire. In June, 1998, Wilshire filed a motion for relief from the automatic stay and to prohibit the debtor from obtaining the benefit of the automatic stay in any future filings. Wilshire claims that Falotico owes approximately $384,000, of which $210,000 is principal.

Falotico's motion to strip off the Wilshire first mortgage and treat it as an unsecured claim was filed in response to the foregoing motion, and as a precursor to confirmation of the Chapter 13 plan. Falotico's plan proposes a monthly payment of $1500 to the Standing Chapter 13 Trustee for sixty (60) months. Under the plan, Falotico also proposes to pay the balance of his attorney's fees of $850 and $70,000 in taxes to the City of Jersey City prior to paying unsecured creditors a five percent (5%) dividend.[2]

---

1. Fleet Finance, Inc. acquired the mortgage from First Colonial in November, 1989. Wilshire thereafter acquired the note and mortgage from Fleet Finance, Inc.

2. Based on the filed proofs of claim, the characterization of the tax claim in the plan appears to be incorrect both as to the holders of the tax claim and the amounts. RTL Trust, as a tax sale

The schedules of income and expenses indicate that Falotico has net monthly wages of $1,948.00 and monthly income from real property of $2,750.00 for total monthly income of $4,698.00. The listed monthly expenses total $2,680.00, and the debtor thus lists monthly excess income of $2,018.00, of which he proposes to devote $1500.00 to the plan. Given the nature of the plan, the debtor does not list any ongoing mortgage obligations as an expense. Surprisingly, the debtor also does not indicate any payments for homeowner's insurance. He does however list a monthly real estate tax expense of $375.00 and monthly home maintenance of $200.00. The plan describes Wilshire, the first mortgagee, as holding an unsecured claim in the amount of $350,000 and American Bank, the second mortgagee, as holding an unsecured claim of $7,500. Thus, Falotico proposes to satisfy the claims of Wilshire and American Bank by payments of $17,500 and $375, respectively. Notably, other than the tax claims and the two mortgages the debtor only lists three other creditors. These claims are classified as unsecured and total $19,200.00.

Falotico claims that he may strip off Wilshire's first mortgage because (i) the property is subject to a paramount tax lien in excess of $70,000 and (ii) he has obtained an appraisal which shows that the property has a fair market value of approximately $59,500. Thus, Falotico concludes that under § 506(a) Wilshire does not hold any secured claim. He further reasons that since Wilshire does not hold a secured claim, it is not protected by the anti-modification provisions of § 1322(b)(2). Alternatively, he also argues that § 1322(b)(2) does not prevent the strip off because the debtor's property is a three family house with a commercial unit. The debtor resides in one unit and rents the remaining units. Falotico argues that Wilshire is thus secured by more than the principal residence and accordingly not protected by the antimodification provision of § 1322(b)(2).

Wilshire does not offer a current appraisal to rebut Falotico's valuation. It seems to concede that over the years the property has declined in value. Wilshire notes that in 1997 it obtained three separate Broker's Price Opinions which ranged from a low of $72,500 to a high of $150,000. By contrast, the two appraisals it obtained in 1993 and 1995 concluded that the property had a fair market value of $175,000 and $170,000 respectively. However, Wilshire contends that any decline in value is attributable to the debtor's own inaction and that he should not be rewarded for failing to maintain his property.

Similarly, Wilshire argues that Falotico's failure to pay real estate taxes should not be used as a basis for stripping off its first mortgage. Although the court requested a further description of the time periods in which taxes went unpaid, neither Falotico nor Wilshire has been able to supply such a history. However, given that the outstanding obligation to Jersey City is in excess of $70,000, it is reasonable to assume that in the last nine years there have been a number of quarters in which Falotico did not pay real estate taxes. Additionally, counsel for Wilshire reports that its records reflect that the RTL Trust tax sale certificates dated June 18, 1992 were noted and then reported to Falotico. The Wilshire records also reflect that part of the negotiations that occurred between Wilshire and Falotico just prior to this third filing concerned an agreement under which Wilshire would have agreed to modify the mortgage terms in exchange for Falotico's agreement to pay all real estate taxes, together with late charges and interest thereon in the approximate amount of $77,000.00. Wilshire further claims that if the parties had finalized their agreement it would have also provided for a tax escrow account in the future. Wilshire suggests that instead of concluding the settlement Falotico commenced the present case and brought the strip down motion. Wilshire argues that in light of this history and the debtor's failure

---

certificate holder, asserts a secured claim of $71,790.05, "plus 18% annual interest until redeemed in full." The City of Jersey City asserts two secured claims of $2,104.16 and $2,158.50 for taxes and water and sewer charges. Thus, the filed secured tax claims amount to $76,052.71.

to pay real estate taxes the court should not permit a strip down of its lien.

The debtor does not contradict the loan history recited by Wilshire. Notably, Falotico claims that he entered into the 1989 refinance because no other lender was available. He claims that a First Colonial representative assured him that after one year of timely payments he could refinance at a lower rate. Falotico states that this assurance proved to be a misrepresentation and that the loan fell into arrears because he could not meet the monthly payments of $3,196.16.

Falotico also argues that the Wilshire first mortgage is not a result of the usual residential purchase money lending transaction, and should not be afforded the protection of § 1322(b)(2). Falotico reasons as follows:

> It is interesting to note that the lender in paragraph 15 talks about mortgage lenders making residential loans to deserving debtors and if a decision was rendered in my favor, it would chill the effect on the mortgage lending process. The lender in this case clearly knew that I was not a deserving debtor. It loaned me money during the peak of the real estate market and in addition charged me eighteen and three quarters percent and also received approximately $25,000 in closing costs at closing. We are not dealing with a purchase money mortgage lender but in fact a lender that profited at the outset of the loan and obviously took on a risk which is why it charged me eighteen and three quarters percent. Clearly this lender could have been protected by requiring the payments of real estate taxes with my monthly mortgage payment but instead chose to take a much riskier approach.

### DISCUSSION

■ If the question before the court solely concerned whether § 1322(b)(2) prevents Falotico, as an owner/occupant of a multi-family house, from stripping off the lien of Wilshire, the matter could be quickly decided in Falotico's favor. This court agrees with the case authority which holds that § 1322 does not bar modification of a secured claim on multi-unit property in which one unit is the debtor's principal residence and the secu-

rity interest extends to the other income producing units. *See Lomas Mortgage Inc. v. Louis,* 82 F.3d 1, 7 (1st Cir.1996); *In re Adebanjo,* 165 B.R. 98, 103–04 (Bankr. D.Conn.1994).

On the § 1322(b)(2) issue, this court finds particularly persuasive the First Circuit's reasoning in *Lomas.* The *Lomas* court first observed that *Nobelman v. American Sav. Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), did not address whether home lenders whose security interest included other property or other income producing units of a debtor's principal residence, could be considered to hold claims secured "only by a security interest in real property that is the debtor's principal residence." 82 F.3d at 3. Thus, the court in *Lomas* determined that *Nobelman* was not dispositive of the matter before it. *Id.*

The First Circuit then evaluated the statutory language and the arguments of both litigants as to the plain meaning of the statute. The court was unable to discern any plain meaning from the statutory language of § 1322(b)(2):

> The "plain meaning" approach to § 1322(b)(2) appears to us to be, in the end, inconclusive. The disputed terms could (as Lomas claims) serve the limited purpose of distinguishing security interests in real property from security interests in personal or other property. But they could also (as the Louises claim) serve the more general purpose of distinguishing lenders secured only by a principal residence from lenders who may have additional security. 82 F.3d at 4.

Thereupon, the *Lomas* court proceeded with a thorough review of the legislative history of § 1322(b). It found that this legislative history also "does not clearly resolve the issue." *Id.* Summing up its review, the court stated:

> [t]his legislative history does tend to show that with § 1322(b)(2) Congress wanted to benefit the residential mortgage market as opposed to the entire real estate mortgage market. It also might suggest that a distinction should be drawn between the residential mortgage market and the market

for investment property. Nevertheless, the legislative history does not state with clarity how a mortgage on a mixed property, one with both residential and investment characteristics, should be treated. While Congress debated over whether to protect all real estate lenders or no real estate lenders and eventually compromised on protecting residential mortgages, Congress did not focus on what to do in the multi-family context.

*Id.* at 5.

As a further step in its analysis, the First Circuit turned to the legislative history to the Bankruptcy Reform Act of 1994 regarding § 1123(b)(5). Section 1123(b)(5) was enacted by Congress, post-*Nobelman,* to add an anti-modification provision to Chapter 11. The First Circuit noted that the language of § 1123(b)(5) is identical to that in § 1322(b)(2) and that Congress stated that the purpose of the new section was to insure that residential mortgages receive treatment in Chapter 11 identical to that in Chapter 13. *Id.* at 6. The court placed great reliance on language in the Judiciary Committee Report which stated that the antimodification provision "does not apply to a commercial property, or to any transaction in which the creditor acquired a lien on property other than real property used as the debtor's residence." *Id.*

The court also found significant the Judiciary Committee Report's reference to *In re Ramirez,* 62 B.R. 668 (Bankr.S.D.Cal.1986) as part of the above-quoted passage. The *Ramirez* court held that the antimodification provision of § 1322(b)(2) does not apply to multiunit houses where the security interest extends to the rental units. *Id.* Thus, the First Circuit concluded that "[g]iven this clear expression of congressional intent, the inference becomes quite strong that Congress believes the antimodification provision in Chapter 13 does not reach such multiunit properties." *Id.*

This court is persuaded that the painstaking analysis undertaken by the First Circuit provides the key to the meaning and application of the antimodification provision of § 1322(b)(2). Accordingly, this court adopts the *Lomas* holding and finds that

§ 1322(b)(2) does not bar Falotico from stripping off the lien of Wilshire.

However, the court's determination that the Wilshire mortgage is vulnerable to a strip-off does not require it to grant such relief. Indeed, the court will not grant the relief sought by Falotico. The court believes that the factual record before it demonstrates that the petition was not filed in good faith and that the proposal to treat the Wilshire mortgage as wholly unsecured is inequitable.

In *In re Lilley,* 91 F.3d 491, 496 (3d Cir.1996) the Third Circuit agreed with the Seventh, Ninth, and Tenth Circuits that lack of good faith in filing a petition is sufficient cause for dismissal under 11 U.S.C. § 1307(c). *See In re Love,* 957 F.2d 1350, 1354 (7th Cir.1992); *In re Eisen,* 14 F.3d 469, 470 (9th Cir.1994); *In re Gier,* 986 F.2d 1326, 1329–30 (10th Cir.1993). The Third Circuit further concurred that the issue of good faith must be determined "on a case-by-case basis in light of the totality of the circumstances." *Id.* As set forth in *Lilley,* the factors which may be considered in an examination of the totality of the circumstances include: (i) the nature of the debt; (ii) the timing of the petition; (iii) how the debt arose; (iv) the debtor's motive in filing the petition; (v) how the debtor's actions affected creditors; (vi) the debtor's treatment of creditor's both before and after the petition was filed; and (vii) whether the debtor has been forthcoming with the bankruptcy court and creditors. *Id.*

Applying the "totality of the circumstances" test to the matter at hand, it is readily apparent that the instant petition is not a good faith filing.

A fair reading of the history of the three Chapter 13 cases reveals that each case was filed to forestall Wilshire from completing the foreclosure process. Of course there is no per se rule that prohibits multiple filings. *See In re Taylor,* 884 F.2d 478, 485 (9th Cir.1989) (multiple filings are justified if each new plan is proposed in good faith). Furthermore, filing a bankruptcy petition on the eve of foreclosure does not necessarily constitute bad faith. *In re Hollis,* 150 B.R.

145, 149 (D.Md.1993). However, the debtor's history of filings and dismissals is probative of bad faith. *In re Dami*, 172 B.R. 6, 10 (Bankr.E.D.Pa.1994); *Taylor*, 884 F.2d at 485. With respect to Falotico's first case, which was filed just three months after Wilshire began the foreclosure, relief from stay was granted to Wilshire in the early months of the case because of Falotico's failure to make mortgage payments outside of the plan, and the case was dismissed shortly thereafter. The second filing was made the day prior to the foreclosure sale. The petition was dismissed approximately two months later because the debtor did not file the balance of his schedules or a Chapter 13 plan and summary. The present filing was made four months later, and after Falotico obtained two adjournments of the rescheduled foreclosure sale.

It is also important to note that, from the limited history available, it appears that Falotico defaulted on the first mortgage very soon after the 1989 refinance. It also appears that throughout the life of the mortgage Falotico did not timely pay the property taxes and thus, the tax debt as well as the mortgage debt grew steadily. Further, it appears that even though the property was generating rental income, Falotico did not apply the rental income to the mortgage, the taxes, or the maintenance of the property. Falotico claims that he couldn't afford to pay the property taxes because his mortgage payments were too high. However, from the dollar amount of taxes due, it appears that even when he was not paying Wilshire he failed to pay the property taxes.

It also appears to the court that with respect to the present case Falotico proceeded in an inequitable manner. Falotico does not contradict Wilshire's statements that just prior to the filing of this petition the parties were negotiating an agreement under which Wilshire would modify the mortgage in exchange for payment of the real estate taxes. It also appears that Falotico had agreed to pay Wilshire $10,000 before the rescheduled sale date of May 6, 1998. Wilshire contends that rather than make this payment or enter into the agreement, Falotico filed this case on May 6, 1998. Falotico does not dispute this version of events. When this pre-filing history is considered in connection with the fact that Falotico's plan proposes to completely strip off the Wilshire lien it does not appear to the court that Falotico engaged in fair negotiation with Wilshire.

Falotico also complains that the property is in need of substantial repairs, and that the disrepair has resulted in a present fair market valuation of $59,500. From the dramatic decline in value, the court can only infer that Falotico has also failed to maintain and repair the property. To the extent that the disrepair is attributable to his failure to maintain the property, Falotico should not reap the benefit of his failure to act.

It is well recognized that bankruptcy courts are courts of equity. *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("... a bankruptcy court is a court of equity at least in the sense that in the exercise of the jurisdiction conferred upon it by the act, it applies the principles and rules of equity jurisprudence."). Thus, the equitable maxim that "one who seeks the aid of equity must do equity" is fully applicable in bankruptcy court. In this court's view, it is this equitable notion which informs the bankruptcy policy that provides a discharge of debt to the honest but unfortunate debtor. Similarly, implicit in the "totality of the circumstances" test for determination of whether a petition is filed in good faith, is the concern that the statute not be employed in an inequitable fashion. As stated by the court in *Eisen*, "[a] judge should ask whether the debtor 'misrepresented facts in his [petition or] plan, unfairly manipulated the Bankruptcy Code, or otherwise [filed] his Chapter 13 [petition or] plan in an inequitable manner.'" 14 F.3d at 470 (quoting *In re Goeb*, 675 F.2d 1386, 1391 (9th Cir.1982)).

In finding that the instant petition is not filed in good faith, the court also finds that the proposed treatment of the Wilshire claim in the plan is inequitable in light of the history which precedes this case. First, based on the filed secured tax claims it appears that the actual distribution to Wilshire as an unsecured claimant would be less than five percent. Such a result would be inequitable given that Wilshire's treatment as an

unsecured creditor under the plan arises from the complete strip off of its first mortgage position. Second, and most importantly, the economic basis for the strip off of the Wilshire lien arises solely from the accrual of property taxes because of Falotico's failure to meet his obligations to pay property taxes. Notably, Falotico's failure to keep his taxes current occurred even though he received rental income from the property. The court is not suggesting that mere nonpayment of the mortgage and property taxes are grounds to find bad faith. There are many reasons why debtors fall into arrears and the Bankruptcy Code protects debtors whose financial wounds are self-inflicted as well as those whose financial predicament arises from circumstances beyond their control. However, where a debtor has repeatedly availed himself of Chapter 13 protection and has also caused the complete erosion of the first mortgagee's secured position, it is not equitable to shift all of the consequences of that course of conduct to the first mortgagee.

■ The court recognizes that dismissal of the instant case was not sought by Wilshire and that the debtor has not had formal notice of the court's intent to dismiss his case. However, 11 U.S.C. § 105(a) provides that "[n]o provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." The court finds that thus provision provides ample authority for its *sua sponte* dismissal of the case. *See In re Fricker*, 116 B.R. 431, 442 (Bankr.E.D.Pa.1990). In *In re Dilley*, 125 B.R. 189, 198 (Bankr.N.D.Ohio 1991) the court also found that § 105 empowered the court to *sua sponte* determine that dismissal of the case would be with prejudice to subsequent filing under Chapter 11 or Chapter 13 for a twelve month period. Wilshire has requested prospective relief and the court grants its request. Accordingly, any future filing by Falotico will not impose an automatic stay as to Wilshire's foreclosure proceedings with regard to 737 Montgomery Street, Jersey City, New Jersey.

## CONCLUSION

For the reasons set forth above, the debtor's case is dismissed under § 1307(c) as not filed in good faith. The motion for relief from the automatic stay is denied except to the extent that prospective relief is granted. The debtor's motion to strip off the Wilshire lien is also denied.