# United States Court of Appeals
## For the First Circuit

No. 02-2501

IN RE MARIA CELINA CARVALHO AND FRANCISCO ANDRADE,
Debtors.

MARIA CELINA CARVALHO AND FRANCISCO ANDRADE,
Plaintiffs, Appellees,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Selya, Circuit Judge,
R. Arnold,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Deirdre J. Keady, with whom Thomas J. Walsh and Harmon Law
Offices, PC were on brief, for appellant.
Jeffrey M. Frankel for appellees.

July 9, 2003

_____
*The Hon. Richard S. Arnold, of the Eighth Circuit, sitting by
designation.

**SELYA**, **Circuit Judge**.  In this case of first impression at the federal appellate level, we must address the effect of post-confirmation default and consequent relief from the automatic stay on the bifurcated lien of a secured creditor.  The creditor claims that, in such circumstances, relief from the automatic stay nullifies the earlier lien-stripping order, mends the bifurcation, and restores the lien on the collateral to its original shape.  Both the bankruptcy court and the district court rebuffed this claim.  We too reject it:  relief from the automatic stay, in and of itself, works no such alchemy.

## I.

## Background

The relevant facts are undisputed.  In 1991, the debtors, Maria Celina Carvalho and Francisco Andrade, borrowed $155,000 from Federal National Mortgage Association (FNMA).  They signed a promissory note in that amount and secured it by granting FNMA a first mortgage on a multi-family residence in Dorchester, Massachusetts (the Property).

Approximately five years later, the debtors filed a voluntary petition under Chapter 13 of the Bankruptcy Code.  See 11 U.S.C. §§ 1301-1330 (allowing individual debtors to reorganize their debts).  FNMA filed a proof of claim, presumably including arrearages, accrued interest, late charges, and the like, in the amount of $165,166.  Several other creditors also filed claims.

-2-

Alleging that the then-current value of the Property was less than the amount owed to FNMA, the debtors asked the court to bifurcate FNMA's claim into secured and unsecured portions. See 11 U.S.C. § 506(a) (stating that the "allowed claim of a creditor secured by a lien on property . . . , is a secured claim to the extent of the value of such creditor's interest . . . and is an unsecured claim to the extent that the value of [such interest] is less than the amount of such allowed claim"); see also id. § 103(a) (making general provisions under Chapter 5 of the Bankruptcy Code applicable to bankruptcy cases under, inter alia, Chapter 13). After some skirmishing, not relevant here, the parties stipulated to the applicability of this lien-stripping protocol. They then agreed to divide the debt into a secured claim of $105,000 (representing the agreed value of the Property) and an unsecured claim for roughly $60,000 (representing the balance of the indebtedness owed to FNMA).

In due course, the bankruptcy court confirmed a Chapter 13 plan (the Plan) that embodied the bifurcation. Under the terms of the Plan, the debtors were to make regular payments to a court-appointed trustee, who would then disburse funds to the various creditors (including FNMA) according to a set schedule. Under this scenario, FNMA was to receive fixed monthly payments on the secured portion of its bifurcated claim until that item was paid in full but was to receive only an aggregate 10% dividend on the unsecured

portion. See id. § 1322(b)(2) (allowing bankruptcy courts to approve Chapter 13 plans modifying the rights of most secured creditors); see also Lomas Mtge., Inc. v. Louis, 82 F.3d 1, 7 (1st Cir. 1996) (interpreting sections 506(a) and 1322(b)(2) of the Bankruptcy Code to allow bifurcation of a secured creditor's claim in a Chapter 13 proceeding). The Plan also incorporated an agreement to the effect that the debtors would continue to pay FNMA directly to fund an escrow account for taxes and insurance on the Property.

At some point — the exact date is of no moment — the debtors began struggling to meet their obligations under the Plan. When they failed to make the obligatory escrow payments, FNMA sought relief from the automatic stay in order to exercise its state-law right of foreclosure against the Property. See 11 U.S.C. § 362(a) & (d)(1) (staying proceedings against a debtor or her estate but allowing a court to lift or modify the stay "for cause"). FNMA's motion acknowledged the bifurcation of its claim and prayed generally for relief from the stay. It did not, however, specify the amount of the debt that it envisioned as secured.

The debtors were not represented by counsel at this point in time and interposed no objection. Accordingly, the bankruptcy court granted FNMA's motion. The court's order did not specify the

amount of the secured claim, nor did it mention (let alone revoke) the earlier bifurcation.

Notwithstanding the lifting of the automatic stay, the debtors continued, albeit with an occasional misstep, to make payments to the trustee as called for by the Plan.[1] When the debtors finally obtained counsel, they moved to vacate the order granting relief from the automatic stay. The bankruptcy court denied this motion on November 13, 2000. For reasons that are not readily apparent from the record, FNMA nonetheless refrained from moving forward with a foreclosure proceeding.

Near the end of the following year, the debtors moved to discharge FNMA's mortgage. By then, they had completed payment of FNMA's secured and unsecured claims as called for by the Plan and had offered to pay the arrearages incurred with respect to the escrow account. Although FNMA had not yet foreclosed on the Property, it steadfastly refused to accept payments from either the trustee or the debtors after the date of default.

Consistent with this position, FNMA objected to the proposed discharge. The main thrust of its objection was that the debtors had not in fact fully paid (or offered to pay) their debt because their payments had tracked the Plan instead of the terms of the seminal promissory note. In FNMA's view, the latter, rather

---

[1]The trustee twice moved to dismiss the case for the debtors' failure to remain current. Both times, however, the debtors managed to bring their payments up to date.

than the former, limned the extent of the debtors' actual obligation because the bankruptcy court's order lifting the automatic stay had, in effect, nullified the earlier bifurcation and reinstated the debt to its original shape. On this basis, FNMA asserted that the debtors could obtain a discharge of the mortgage only by paying the full contractual amount owed on the original indebtedness, dollar for dollar.

The debtors vehemently disagreed with this logic, and the bankruptcy court rejected it. The court concluded that lifting the automatic stay lacked the talismanic significance envisioned by FNMA. It held, moreover, that the confirmation of the Plan had a res judicata effect, thus limiting FNMA's entitlement to the amounts provided for in the Plan. Accordingly, the court enjoined any foreclosure pending an assessment of the debtors' ability to cure the earlier default.

On FNMA's first-tier appeal, the district court affirmed the injunction (albeit on a somewhat different rationale). This second-tier appeal followed. See 28 U.S.C. § 158(a) & (d).

## II.

### Analysis

As the parties have framed the case, the central issue is not whether the debtors have a right to attempt to cure their default, but, rather, how much they must pay in order to do so. In making this determination, the court of appeals normally looks to

the bankruptcy court's decision, scrutinizes that court's findings of fact for clear error, and affords de novo review to its conclusions of law. See Jamo v. Katahdin Fed. Credit Union (In re Jamo), 283 F.3d 392, 401 (1st Cir. 2002). Under this paradigm, we owe no particular deference to the conclusions of the intermediate appellate tribunal (be it a district court or a bankruptcy appellate panel). Brandt v. Repco Printers & Lithographics, Inc. (In re Healthco Int'l, Inc.), 132 F.3d 104, 107 (1st Cir. 1997). Where, as here, the core dispute is over a question of law, engendering de novo review, Jamo, 283 F.3d at 401, we are not wedded to the bankruptcy court's rationale, but, rather, may affirm its decision on any independently sufficient ground made manifest by the record. T I Fed. Credit Union v. DelBonis, 72 F.3d 921, 929 (1st Cir. 1995); Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 68 F.3d 26, 30 (2d Cir. 1995).

Before plunging into our analysis, we deem it important to note what FNMA does not contest. In mounting this appeal, it challenges neither the validity of the Plan nor the bifurcation of its claim within the Plan as originally formulated. This bears out our intuition that both the Plan and the bifurcation were properly drafted and implemented under existing law. See, e.g., Lomas Mtge., 82 F.3d at 7; Sapos v. Provident Inst. of Sav., 967 F.2d

918, 925-26 (3d Cir. 1992).[2] Turning to the contentions that FNMA does advance, its principal thesis is that relief from the automatic stay, in and of itself, unlocked the shackles of the Plan; once the bankruptcy court lifted the stay, this thesis runs, the Plan no longer bound it in any way (and, therefore, the concessions embodied in the Plan went up in smoke).

The debtors' initial response is that the fact of confirmation has a res judicata effect sufficient to trump FNMA's thesis. This counterattack has a certain superficial appeal. Broadly stated, the doctrine of res judicata operates to bar the relitigation of issues that were or could have been raised in an earlier action between the same parties prescinding from the same set of operative facts. See Allen v. McCurry, 449 U.S. 90, 94 (1980); Kale v. Combined Ins. Co., 924 F.2d 1161, 1165-66 (1st Cir. 1991). The doctrine is not foreign to bankruptcy practice in general or to Chapter 13 proceedings in particular. Thus, confirmation of a Chapter 13 plan customarily is res judicata as to all issues that were or could have been decided during the

_____

[2]Typically, bifurcation does not apply to a debtor's principal residence. See 11 U.S.C. § 1322(b)(2). Here, a part of the Property served as the debtors' principal residence, but FNMA's loan was nonetheless subject to bifurcation because the loan was simultaneously secured by other collateral (i.e., the remaining units in the multi-family tenement). See Lomas Mtge., 82 F.3d at 7 (holding that the Bankruptcy Code does not prohibit lien-stripping with regard to multi-unit dwellings); Hammond v. Commonwealth Mtge. Corp. (In re Hammond), 27 F.3d 52, 56-57 (3d Cir. 1994) (allowing bifurcation of lien secured by both a principal residence and personal property).

-8-

confirmation process.  See Universal Am. Mtge. Co. v. Bateman (In re Bateman), 331 F.3d 821, ___ (11th Cir. 2003) [No. 02-11221, slip op. at 7]; 5 Lawrence P. King et al., Collier on Bankruptcy ¶ 1327.01, at 1327-2 (15th ed. 2002).

Although we accept this general rule, it does not pertain here.  A debtor's post-confirmation default, like many other post-confirmation events, does not come within the preclusive reach of a confirmed plan.  See Barbosa v. Soloman, 235 F.3d 31, 39 n.11 (1st Cir. 2000); Ellis v. Parr (In re Ellis), 60 B.R. 432, 434 (B.A.P. 9th Cir. 1985).  This is because the factual circumstances surrounding post-confirmation events could not have been considered and resolved by a bankruptcy court at the time of confirmation. See Harmon v. United States ex rel. Farmers Home Admin., 101 F.3d 574, 582 n.5 (8th Cir. 1996); In re Shaffer, 48 B.R. 952, 957-58 (Bankr. N.D. Ohio 1985).  It follows that res judicata does not supply a serviceable shield in this case.  Consequently, we hold that confirmation of the Plan, without more, did not bar FNMA from litigating the validity or value of its claim in light of subsequent (post-confirmation) developments.

Still and all, rejecting a res judicata argument is a far cry from saying that FNMA's full contractual lien has been resurrected.  FNMA labors to persuade us that the debtors' post-confirmation default, coupled with FNMA's securing of relief from

the automatic stay, produced just such a Lazarus-like effect. We are not convinced.

FNMA's asseveration relies heavily upon In re Miano, 261 B.R. 391 (Bankr. D.N.J. 2001). At first blush, Miano bears a family resemblance to the case at hand. There, as here, an undersecured creditor acquiesced in bifurcation of its claim against the debtors. Id. at 392. There, as here, the creditor obtained relief from the automatic stay after the debtors failed to comply with the confirmed plan. Id. There, as here, the creditor demanded full payment of the original indebtedness. In a brief opinion, the bankruptcy court found for the creditor, reasoning that once the debtors defaulted and the court lifted the stay, the confirmed plan no longer bound the creditor. Id. at 392-93.

Upon careful perscrutation, we find that the resemblance between the two cases is more apparent than real. There are a number of salient distinctions. For one thing, the Miano debtors sold the encumbered property at a price much higher than the value originally ascribed to it by the bankruptcy court. In contradistinction, the instant debtors have not sold the Property at all (indeed, they have made plain their desire to retain possession of it). For another thing, Miano involved a short-term situation in which the debtors made absolutely no payments under the confirmed plan. This stands in stark contrast to the situation before us, where the Plan has run its course and the debtors have

made virtually all the payments called for under it (they have even offered to make the side payments due to FNMA, albeit with some hiccoughs along the way). While principles of equity may suggest that Chapter 13 debtors who turn their backs on a confirmed plan from the get-go cannot expect to reap its benefits, cf. In re Pearson, 214 B.R. 156, 164 (Bankr. N.D. Ohio 1997) (referring to effect of conversion from Chapter 13 to Chapter 7), the debtors in this case did not forsake the Plan. To the contrary, they struggled mightily to comply with its provisions.

Even leaving these distinctions to one side, we find the Miano decision singularly unpersuasive. The court's legal analysis strikes us as seriously flawed. Moreover, the decision rests on a porous legal foundation; none of the cases cited by the court stands for the proposition that relief from the automatic stay necessarily includes relief from the confirmed plan as a whole. Even when read for all they are worth, these cases at most reiterate the venerable saw that a debtor's post-confirmation default can provide good cause for relief from the automatic stay. See, e.g., W. Equities Inc. v. Harlan (In re Harlan), 783 F.2d 839, 841 (9th Cir. 1986) (per curiam); Ellis, 60 B.R. at 434; In re Binder, 224 B.R. 483, 490 (Bankr. D. Colo. 1998); In re Smith, 104 B.R. 695, 700 (Bankr. E.D. Pa. 1989); In re Wright, 54 B.R. 553, 555 (Bankr. E.D. Pa. 1985); Anaheim Sav. & Loan Ass'n v. Evans (In re Evans), 22 B.R. 980, 983 (Bankr. S.D. Cal. 1982). Indeed, many

-11-

of the cases indicate that, in spite of relief from the automatic stay, the confirmed plan continues to bind both debtors and creditors in other respects. See, e.g., Ellis, 60 B.R. at 436 (allowing debtor to cure a default by resuming payments under the confirmed plan notwithstanding the granting of relief from the automatic stay); Binder, 224 B.R. at 490 ("Granting relief from stay for Debtor's default in performance of post-confirmation obligations to [Creditor] does not upset the plan; it implements it."). We therefore refuse FNMA's invitation to accord Miano precedential force.

FNMA mounts one last argument in support of reversing the lien-stripping order and reinstating the full amount of the original debt. It asserts that a Chapter 13 plan is akin to a contract and that, given their default, the debtors cannot now expect FNMA to perform its side of the bargain. This argument is unavailing.

To the extent that a confirmed plan resembles a contract, there is no legally sound reason why the remedy for every default necessarily should be rescission. Generally speaking, the law of contracts recognizes a wide spectrum of potential anodynes. See generally 3 E. Allan Farnsworth, Farnsworth on Contracts §§ 12.1 to 12.3 (2d ed. 2003). Here, it seems clear that, under the bankruptcy court's ukase, FNMA stands to receive a condign remedy (either specific performance or expectation damages) with respect

to the debtors' default.  The root purpose of a contract remedy is "to place the plaintiff-promisee in as good a position as [it] would have occupied had the defendant-promisor not breached the contract," 24 Richard A. Lord, <u>Williston on Contracts</u> § 64:1, at 7 (4th ed. 2002) (collecting cases), and either of these remedies would accomplish that goal by making FNMA whole.  That is why other courts have approved the use of such remediation in comparable circumstances.  <u>See</u>, <u>e.g.</u>, <u>Ellis</u>, 60 B.R. at 436 (allowing debtor to avoid foreclosure so long as she cured the default on her reorganization plan); <u>cf.</u> <u>Green Tree Accept., Inc.</u> v. <u>Hoggle</u> (<u>In re Hoggle</u>), 12 F.3d 1008, 1010 (11th Cir. 1994) (emphasizing that permitting debtors to cure post-confirmation defaults is consistent with Chapter 13's overarching policy).

FNMA resists this straightforward answer, urging us to subject defaulting debtors to a more draconian penalty in order to discourage repetitive defaults and a generally nonchalant attitude anent compliance with reorganization plans.  We regard such punitive measures as unnecessary, unwise, and incompatible with the goals of the Bankruptcy Code.  We explain briefly.

Bankruptcy law endeavors to strike an equitable balance between the debtors' needs — especially the need for a fresh start — and the creditors' rights.  The bankruptcy court must hold that delicate balance steady and true.  As matters stand, the Code gives bankruptcy courts more than adequate powers to ensure that debtors

do not engage in gamesmanship or otherwise flout the provisions of Chapter 13.  See Perry v. Commerce Loan Co., 383 U.S. 392, 404 (1966); Hoggle, 12 F.3d at 1011-12.  To accept FNMA's position would tilt the scales in favor of secured creditors, allowing them to use the fortuity of even a technical post-confirmation default to disrupt a confirmed plan.  That would confuse the function of an order lifting the automatic stay with the function of an order dismissing a Chapter 13 petition.

## III.

## Conclusion

We need go no further.  In this case, we have been asked to hand a new weapon to a secured creditor at the expense of the debtors' honest efforts to carry out the provisions of a confirmed plan of reorganization.  Neither the Bankruptcy Code nor the case law affords any compelling reason why we should do so.  We hold, therefore, that bifurcation of a creditor's claim into secured and unsecured portions is not annulled by the mere act of granting relief from the automatic stay.[3]  Consequently, we affirm

---

[3]We regard it as unlikely that a bankruptcy court has the authority, in the exercise of its discretion, to rescind a lien-stripping order merely because it deems the creditor entitled to relief from the automatic stay. After all, Chapter 13 is designed to ensure that debtors enjoy a fresh start. See H.R. Rep. No. 95-595, at 118 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6078-79. Exceptions to this policy should be construed narrowly. In re Pelkowski, 990 F.2d 737, 744-45 (3d Cir. 1993). Moreover, allowing the easy resurrection of contractual liens would likely redound to the detriment of other creditors. See Harmon, 101 F.3d at 583 (suggesting that a creditor's retention of its full,

the order staying foreclosure until the debtors' ability to cure their post-confirmation default can be ascertained.  To that end, we remand this case to the district court with instructions that it, in turn, remand the matter to the bankruptcy court for further proceedings aimed at determining the precise amounts owed to FNMA and what fees and interest, if any, should be assessed in consequence of the debtors' earlier default.

**Affirmed**.  **Costs shall be taxed in favor of the appellees**.

---

original lien even after lien-stripping "might violate the prohibition against differential treatment within the class of unsecured claims"); United Carolina Bank v. Hall, 993 F.2d 1126, 1128-29 (4th Cir. 1993) (explaining that even after a post-confirmation default and a consequent lifting of the stay, allowing excess payments would "adversely affect[] other creditors, as the resources available in a Chapter 13 proceeding are finite").  Here, however, the bankruptcy court has made plain that it never intended to restore FNMA's contractual lien against the debtors to its original contours.  Thus, we need not determine the scope of the bankruptcy court's discretionary authority.