USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-1956 LOMAS MORTGAGE, INC., Appellant, v. ESPERANDIEU & ANTONINE LOUIS, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Aldrich and Bownes, Senior Circuit Judges. _____________________ ____________________ John J. Monaghan, with whom Deborah Paige Stone and Sherburne, _________________ ____________________ __________ Powers & Needham, P.C. were on brief, for appellant Lomas Mortgage, _______________________ Inc. Gary Klein, with whom National Consumer Law Center, Joseph G. ___________ ______________________________ _________ Albiani and Joseph G. Albiani and Associates were on brief, for _______ ___________________________________ appellees Esperandieu and Antonine Louis. ____________________ April 18, 1996 ____________________ LYNCH, Circuit Judge. At issue is the important LYNCH, Circuit Judge. ______________ question of whether 1322(b)(2) of the Bankruptcy Code, 11 U.S.C. 1322(b)(2), prevents Chapter 13 debtors from "stripping down" their primary residence mortgages when the debtors reside in a multi-family house. "Stripping down" would advantage such homeowners by permitting them to cap the dollar amount of the security interest in the home to the home's actual value rather than the higher amount of the note itself. The difference would be treated as unsecured debt. That advantage is denied to resident single-family homeowners by 1322(b)(2). This case thus raises the question of whether the "strip down"1 protections which Congress denied to owners residing in single-family homes, in order to encourage the flow of residential mortgage funds, are nonetheless available to owner occupants of multi-family housing. We hold that Congress intends exactly such different results and that the antimodification provision of 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one unit is the debtor's principal residence and the security interest extends tothe other income-producing units.  ____________________ 1. The term "strip down" is a colloquialism used to describe the process by which a secured creditor's lien is limited to the market value of its collateral. The term "cram down" is also commonly used to describe this process. See, e.g., In ___ ____ __ re Wilson, 174 B.R. 215, 218 n.2 (Bankr. S.D. Miss. 1994); In _________ __ re Lutz, 164 B.R. 239, 241 (Bankr. W.D. Pa. 1994), rev'd on _______ ________ other grounds, 192 B.R. 107 (W.D. Pa. 1995).  _____________ -2- 2 Esperandieu and Antonine Louis own a three-family home at 221 Spring Street in Brockton, Massachusetts. Lomas Mortgage, Inc. holds the mortgage on the property. The mortgage secures a note executed on February 19, 1987, for $159,300. The mortgage is in the standard FNMA form for single-family dwellings, with the standard FNMA one- to four- family rider, including an assignment of rents. The Louises hold a one-half interest in the property. The other half is owned by Mr. Louis's brother, who occupies a second unit. The third unit is leased to tenants. Between the time of the 1987 mortgage and the filing of the bankruptcy petition on January 22, 1995, Massachusetts suffered a severe recession. The recession resulted in a general decline in property values, in unemployment, and other harsh realities. The Louises' neighborhood in Brockton was not immune and foreclosures in the neighborhood became common. Eventually, the Louises themselves could not meet their mortgage payments. They defaulted on the note held by Lomas, and Lomas started foreclosure proceedings. The Louises filed a voluntary petition under Chapter 13, and the foreclosure was stayed. The Louises then moved to bifurcate or "strip down" Lomas's claim into a secured claim for the actual value of the property, agreed to be $80,000, and an unsecured claim -3- 3 for the balance, citing 11 U.S.C. 506(a).2 The Louises could not take advantage of 506(a), however, if Lomas's security for the note extended only to real property that is the Louises' principal residence. That is because 1322(b)(2), which governs Chapter 13 plans, provides: (b) Subject to subsections (a) and (c) of this section, the plan may -- (2) modify the rights of holders of secured claims, other than a claim secured only _______________________________ by a security interest in real _______________________________ property that is the debtor's _______________________________ principal residence, or of _____________________ holders of unsecured claims, or leave unaffected the rights of holders of any class of claims. 11 U.S.C. 1322(b)(2) (emphasis supplied). The Supreme Court has held that the "other than" language of 1322(b)(2), called an "antimodification  ____________________ 2. Section 506(a) provides, in pertinent part: An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. 11 U.S.C. 506(a). Section 506(a) allows a debtor to limit a creditor's secured claim to the value of the underlying collateral. Any amount of the secured claim exceeding the value of the collateral becomes unsecured. Section 506(a) is a general provision under Chapter 5 of the Bankruptcy Code and thus is applicable to individual bankruptcy cases under Chapter 13. See 11 U.S.C. 103(a). ___ -4- 4 provision," In re Hammond, 27 F.3d 52, 55 (3d Cir. 1994), ______________ bars bifurcation where the creditor's secured claim "is secured only by a lien on the debtor's principal residence." Nobelman v. American Sav. Bank, 508 U.S. 324, 332 (1993). In ________ __________________ Nobelman, the Supreme Court addressed a Chapter 13 plan to ________ modify a home mortgage lender's secured claim on joint debtors' owner-occupied condominium. The debtors owed $71,335 in principal, interest, and fees under a note payable to the lender and secured by a deed of trust on the condominium. The debtors' Chapter 13 plan proposed to make monthly payments required by the note up to $23,500, the value of the residence, and, relying on 506(a), to treat the remainder of the lender's claim as unsecured. Id. at ___ 326. The lender objected to the plan, asserting that, 506(a) notwithstanding, 1322(b)(2) prohibited the debtors from modifying its rights under the note secured by the deed of trust on the condominium. Although noting that the debtors were correct to seek valuation pursuant to 506(a) in order to determine whether the lender in fact held a secured claim, the Court held that the valuation determination under 506(a) "does not necessarily mean that the 'rights' the bank enjoys as a mortgagee, which are protected by 1322(b)(2), are limited by the valuation of its secured claim [under 506(a)]." Id. at 329. ___ -5- 5 Determining that the term "rights" in 1322(b)(2) refers to rights reflected in the relevant mortgage instrument enforceable by state law, the Court held that  1322(b)(2) prohibited the debtor from bifurcating the lender's claim into secured and unsecured portions. Id. at ___ 331-32. Because the lender's contractual rights were contained in a unitary note, it would be impossible for the debtor to modify the rights of the lender as to the unsecured portion of its claim without also modifying the terms of the secured component. Id. Thus, the court held, "to give ___ effect to 506(a)'s valuation and bifurcation of secured claims through a Chapter 13 plan in the manner petitioners propose would require a modification of the rights of the holder of the security interest." Id. at 332. Thus Nobelman ___ ________ provides that if a lender's claim "is secured only by a lien on the debtor's principal residence," id., bifurcation under ___ 506(a) will, in most cases, be prohibited. Nobelman, however, did not address the question of ________ what secured claims would be considered "secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. 1322(b)(2). Nobelman ________ noted that one of the purposes of the provision was to give special protection to home lenders in order to encourage the flow of capital into the home lending market. See Nobelman, ___ ________ 508 U.S. at 332 (Stevens, J., concurring) (citing Grubbs v. ______ -6- 6 Houston First Am. Sav. Ass'n, 730 F.2d 236, 245-46 (5th Cir. _____________________________ 1984)). The precise question of whether home lenders whose security interest extended beyond the principal residence to other property or other income-producing components of the principal residence could be considered to have claims secured "only by a security interest in real property that is the debtor's principal residence" was not raised in Nobelman. ________ This case raises that question. In their motion before the bankruptcy court, the Louises argued that the antimodification provision of 1322(b)(2), as interpreted by Nobelman, did not reach the ________ security interest Lomas had on 221 Spring Street because Lomas's security interest extended to the entire property, including the income-producing components. Lomas objected, arguing that 1322(b)(2)'s antimodification provision applied because its security interest was only on 221 Spring Street and the property included the Louises' principal address. The bankruptcy court agreed with the Louises and allowed the motion to bifurcate. The district court affirmed the order and Lomas appeals. Review of the bankruptcy court's conclusion of law is de novo. See In re Winthrop Old __ ____ ___ __________________ Farm Nurseries, Inc., 50 F.3d 72, 73 (1st Cir. 1995). ____________________ The Louises' "principal residence" is 221 Spring Street. Were the property a single-family house, 1322(b)(2)'s antimodification provision surely would apply -7- 7 and bar bifurcation, assuming Lomas's security interest did not extend to any other property. See, e.g., In re Hammond, ___ ____ _____________ 27 F.3d 52 (3d Cir. 1994) (note secured by home and by personal property within the home is outside scope of antimodification provision); see also 5 Collier on Bankruptcy ___ ____ _____________________ 1322.06[1][a], at 1322-21 to 1322-23 (Lawrence P. King ed., 15th ed. 1995) (a claim secured by any other real property or by personal property of the estate or debtor, or by personal property of another may be modified by the Chapter 13 plan). Starting, as they should, with the language of 1322(b)(2), see Consumer Prod. Safety Comm'n v. GTE ___ _______________________________ ___ Sylvania, Inc., 447 U.S. 102, 108 (1980) ("the starting point ______________ for interpreting a statute is the language of the statute itself"), Lomas and the Louises present competing constructions of the statutory language. Lomas argues that the term "only" modifies "by a security interest in real property" and the term "that is the debtor's principal residence" further modifies "real property." Lomas's reading results in 1322(b)(2) applying when (1) the security interest is only in real property (as opposed to personal, intangible or other non-real property) and (2) the real property is the "debtor's principal residence." Under this reading, there is no need that the real property be "only" the debtor's principal residence. -8- 8 The Louises, in contrast, argue (1) that "only" modifies the entire phrase "by a security interest in real property that is the debtor's principal residence"; and (2) that the word "is" requires complete and exclusive identity between "real property" and "principal residence."3 Lomas criticizes the Louises' reading on the ground that the statutory language does not explicitly state that the real property must be "exclusively" the debtor's principal residence. The Louises criticize Lomas's reading on the ground that the statutory language does not explicitly state that the real property must merely "contain" or "include" the principal residence. The "plain meaning" approach to 1322(b)(2) appears to us to be, in the end, inconclusive. The disputed terms could (as Lomas claims) serve the limited purpose of distinguishing security interests in real property from security interests in personal or other property. But they could also (as the Louises claim) serve the more general  ____________________ 3. The Louises' reading is the approach preferred in the case law. See In re Adebanjo, 165 B.R. 98, 104 (Bankr. D. ___ _______________ Conn. 1994) (collecting cases); accord In re McGregor, 172 ______ _______________ B.R. 718, 720 (Bankr. D. Mass. 1994) ("If [Congress intended to extend 1322(b)(2) to multi-unit buildings,] the statute should refer to real property that 'includes' the residence. Instead, the word 'is' appears, which more aptly describes an equivalence between the real estate and the residence."); In __ re Legowski, 167 B.R. 711, 714-15 (Bankr. D. Mass. 1994) ____________ (employing same plain meaning argument); but see In re ________ ______ Guilbert, 165 B.R. 88, 90 (Bankr. D.R.I. 1994) (rejecting ________ that plain meaning approach), rev'd on other grounds, 176 ________________________ B.R. 302 (D.R.I. 1995). -9- 9 purpose of distinguishing lenders secured only by a principal residence from lenders who may have additional security. Cf. ___ In re Legowski, 167 B.R. 711, 714 n.9 (Bankr. D. Mass. 1994) ______________ ("Meaning is always plain to the proponent of an interpretation."). "When ambiguity is identified, a dispute about a statute's or regulation's proper construction cannot be resolved simply by placing the gloss of 'plain meaning' on one competing interpretation." Massachusetts v. Blackstone _____________ __________ Valley Elec. Co., 67 F.3d 981, 986 (1st Cir. 1995).  ________________ Given the lack of plain meaning, we turn to legislative history for guidance. See United States v. ___ _____________ O'Neil, 11 F.3d 292, 297-98 (1st Cir. 1993) (resort to ______ legislative history is proper where "there is room for disagreement" over the meaning of statutory language). The legislative history of 1322(b)(2) does not clearly resolve the issue. Section 1322(b)(2) was enacted as part of the Bankruptcy Code of 1978. The Bankruptcy Code of 1978 was the culmination of a legislative process that began in 1970, the year the Congress created the Commission on the Bankruptcy Laws of the United States. In 1973 the Commission issued a report containing its findings and recommendations and a draft bill. Section 6-201(2) of the Commission's draft bill was the predecessor of what eventually became 1322(b)(2). It provided that a plan under Chapter 13 "may include -10- 10 provisions dealing with claims secured by personal property severally, on any terms, and may provide for the curing of defaults within a reasonable time and otherwise alter or modify the rights of the holders of such claims." Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 137, 93d Cong., 1st Sess., pt. II, at 204 (1973). The focus of this provision was on modification of claims secured by personal property. It apparently would have left largely untouched then existing law in which security interests in real property were excluded from the provisions of Chapter XIII. See id. pt. I, at 165 (stating ___ ___ that claims that may be dealt with under Chapter XIII include secured and unsecured claims, but that claims secured by estates in real property or "chattels real" were excluded from Chapter XIII).4 But the bill as reported out of the House, H.R. 8200, had quite different language in 1322(b)(2) than that proposed by the Commission Report. H.R. 8200 provided in 1322(b)(2) that a debtor's plan might "modify the rights of holders of secured claims or of holders of unsecured claims." See H.R. 8200, 95th Cong., 1st Sess. 1322(b)(2) (1977). ___  ____________________ 4. The Commission did provide in section 6-201(4) that a plan may include provisions for curing defaults within a reasonable time on claims secured by a lien on the debtor's residence. See Report on the Commission on the Bankruptcy ___ Laws of the United States, H.R. Doc. No. 137, 93d Cong., 1st Sess., pt. II, at 204.  -11- 11 Although the accompanying House Report did not specifically state that this language would allow for modification of secured claims in real as well as personal property, see H.R. ___ Rep. No. 595, 95th Cong., 1st Sess. 124 (1977), the report does not suggest that the term "claim" which otherwise has quite broad application, should somehow be limited to claims in personal property in this context. H.R. 8200 was passed by the House and sent to the Senate, but the Senate chose to consider simultaneously S. 2266, which had been reported out of the Senate Judiciary Committee on July 14, 1978. The version of 1322(b)(2) in S. 2266 provided that a debtor's plan may "modify the rights of holders of secured claims (other than claims wholly secured by mortgages on real property) or of holders of unsecured claims." S. 2266, 95th Cong., 2d Sess. 1322(b)(2) (1978). This language, which would preclude modification of any claim wholly secured by a real estate mortgage, appears to have been the product of testimony given during hearings before a Senate Judiciary Committee subcommittee to the effect that H.R. 8200 would cause "residential mortgage lenders to be extraordinarily conservative in making loans in cases where the general financial resources of the individual borrower are not particularly strong." See Hearings Before ___ the Subcomm. on Improvements of the Judicial Machinery of the -12- 12 Senate Comm. on the Judiciary, 95th Cong., 1st Sess. 707 (1977) (statement of Edward J. Kulik, Senior Vice President, Real Estate Div., Mass. Mut. Life Ins. Co.). Mr. Kulik recommended that H.R. 8200 should be changed so that, at the least, "a mortgage on real property other than investment property may not be modified." Id. at 714. When Mr. Kulik ___ was specifically asked about the effect of the bill on individual home mortgages (as opposed to its effect on limited partnerships), Mr. Kulik's attorney, Robert O'Malley, asked to speak and said, "savings and loans will continue to make loans to individual homeowners, but they will tend to be, I believe, extraordinarily conservative and more conservative than they are now in the flow of credit." Id. ___ at 715. The final version of 1322(b)(2) came after H.R. 8200 and S. 2266 (passed by the Senate as an amendment to H.R. 8200) were shaped into a compromise bill through a series of agreed-upon floor amendments. As part of that process, the Senate backed off its position that no modifications would be permitted of any mortgage secured by real estate and agreed to more limited antimodification language for 1322(b)(2). Modification would not be allowed on claims "secured only by a security interest in real -13- 13 property that is the debtor's principal residence." 11 U.S.C. 1322(b)(2).5 This legislative history does tend to show that with 1322(b)(2) Congress wanted to benefit the residential mortgage market as opposed to the entire real estate mortgage market. It also might suggest that a distinction should be drawn between the residential mortgage market and the market for investment property. Nevertheless, the legislative history does not state with clarity how a mortgage on a mixed property, one with both residential and investment characteristics, should be treated. While Congress debated over whether to protect all real estate lenders or no real estate lenders and eventually compromised on protecting residential mortgages, Congress did not focus on what to do in the multi-family context.  ____________________ 5. The explanatory statement of the provision, while noting the Senate's compromise on the mortgage issue, does not state the extent of the compromise: Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under section 1322(b)(5) of the House amendment. 124 Cong. Rec. H11106 (daily ed. Sept. 28, 1978). -14- 14 Lomas suggests that there is no need for such specific evidence in the legislative history. According to Lomas, it is enough that Congress intended to protect home mortgage lenders. Lomas argues that a mortgage on a three- family house is just as much a "home" mortgage as a mortgage on a single-family house, and that any distinction between a three-family and one-family for these purposes is arbitrary. If one accepts this premise,6 Lomas's point has some force. If the antimodification provision is meant to encourage home lending, then excluding multi-family houses would tend to harm (in relative terms) those purchasing property in urban neighborhoods, where owner-occupied multi-unit housing would tend to be more common, and to favor those purchasing single- family homes, more common in suburbia. The theory is that lenders would face relatively more risk of modification in the case of default in urban areas, and interest rates on loans in those areas would rise accordingly. The legislative history certainly does not show Congress intended the ___ antimodification provision of 1322(b)(2) to benefit suburbanites to a greater degree than city dwellers. Still, the legislative history is silent on the scope of the incentive Congress wished to give home lenders. Congress certainly could have viewed single-family homes as  ____________________ 6. The Louises dispute this assertion. They claim that the underwriting practices for two- to four-family houses are different from those for single-family houses.  -15- 15 less likely to be secured by other collateral, such as rents, than multi-family properties. Further, condominiums are common in cities and a condominium in which the debtor resides is covered by the antimodification provision. See ___ Nobelman, 508 U.S. at 332. This blunts some of the force of ________ Lomas's claim that the Louises' interpretation would create a disparate and perhaps unfair application of the antimodification provision.  Additionally, extending the antimodification provision to multi-family houses would also create a difficult line-drawing problem. It is unlikely Congress intended the antimodification provision to reach a 100-unit apartment complex simply because the debtor lives in one of the units. Limiting the antimodification provision to single-family dwellings creates a more easily administered test. We are left then without clear guidance on the question here from either the language or contemporaneous legislative history of 1322(b)(2). But there is guidance from another source: the amendments to Chapter 11 contained in the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 (1994) (codified in scattered sections of 11 U.S.C.). In those amendments Congress referred favorably to case law under Chapter 13 holding that the antimodification provision did not apply to multi-family housing, and -16- 16 established that it wished petitions under Chapter 11 and Chapter 13 to treat the matter in the same way. As part of the 1994 Act and post-Nobelman, Congress ________ added for the first time a home mortgagee antimodification provision to Chapter 11. See Pub. L. No. 103-394, Title II, ___ 206, Oct. 22 1994, 108 Stat. 4123 (codified at 11 U.S.C. 1123(b)(5)) (a Chapter 11 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence"). The antimodification language of 1123(b)(5) is identical to that of 1322(b)(2). The legislative history of 1123(b)(5) reveals that Congress deliberately tracked the antimodification language of 1322(b)(2) and intended conformity of treatment between Chapter 13 and Chapter 11: This amendment conforms the treatment of residential mortgages in chapter 11 to that in chapter 13, preventing the modification of the rights of a holder of a claim secured only by a security interest in the debtor's principal residence. H.R. Rep. No. 835, 103d Cong., 2d Sess. 46 (1994), reprinted _________ in 1994 U.S.C.C.A.N. 3340, 3354. __ More importantly, the legislative history of 1123(b)(5) specifies the limits of its antimodification provision. That history specifies that the antimodification provision of 1123(b)(5) -17- 17 does not apply to a commercial property, or to any transaction in which the creditor acquired a lien on property other than real property used as the debtor's residence. Id. (footnote omitted). This passage from the Judiciary ___ Committee Report refers to In re Ramirez, 62 B.R. 668 (Bankr. _____________ S.D. Cal. 1986), as an example of a case in which the antimodification provision of Chapter 11 would not apply. See H.R. Report No. 835 at 46 n.13. Ramirez, a case ___ _______ construing the antimodification provision of 1322(b)(2), squarely holds that the antimodification provision of 1322(b)(2) does not apply to multi-unit houses where the security interest extends to the rental units.7 Given this clear expression of congressional intent, the inference becomes quite strong that Congress believes the antimodification provision in Chapter 13 does not reach such multi-unit properties. Cf. 5 Collier on Bankruptcy, supra,  ___ _____________________ _____ 1322.06[1][a], 1322-23 n.13 (stating that Ramirez was cited _______ by Congress in the Bankruptcy Reform Act of 1994 as a correct statement of the current law of 1322(b)(2)).  That this evidence from the 1994 Act is a species of subsequent, not contemporaneous, legislative history gives us little pause. "Although subsequent legislative history is  ____________________ 7. In Ramirez the lender held a security interest in _______ property that consisted of the debtor's principal residence and two rental units. See 62 B.R. at 668-69. The facts of ___ Ramirez do not appear to be distinguishable in any relevant _______ way from the facts here. -18- 18 less authoritative than contemporaneous explanation, subsequent Congressional declaration of an act's intent is entitled to great weight in statutory construction." Roosevelt Campobello Int'l Park Comm'n v. E.P.A., 711 F.2d ________________________________________ ______ 431, 436-37 (1st Cir. 1983) (citing Seatrain Shipbuilding _____________________ Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980)). The 1994 _____ _____________ Act evidences a deliberate choice on the part of Congress under Chapter 11 to exclude security interests in multi-unit properties like that here from the reach of the antimodification provision based on its understanding that Chapter 13's antimodification provision did not reach such security interests. To disregard such evidence would frustrate the uniform treatment under Chapters 11 and 13 of secured interests in debtors' principal residences that was so clearly Congress's aim in amending 1123(b)(5). We hold that the antimodification provision of 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to the other income-producing units. Because Lomas's security interest extends to the additional rental units of 221 Spring Street, the antimodification provision of -19- 19 1322(b)(2) does not apply to that interest, and bifurcation pursuant to 506(a) is appropriate.8 If we are wrong as to what Congress intended, legislation can provide a correction. Affirmed. Parties to ________ ___________ bear their own costs.  ____________________  ____________________ 8. The Louises have presented an alternative theory for holding the antimodification provision of 1322(b)(2) inapplicable to Lomas's security interest in 221 Spring Street. The Louises point out that Lomas is entitled to the rents from 221 Spring Street under an assignment of rents provision. The Louises argue that under Massachusetts law the assignment of rents provision is additional security in other, non-real property, and that, consequently, the antimodification provision would not apply. See Hammond, 27 ___ _______ F.3d at 57. Lomas disputes the Louises' interpretation of Massachusetts law, however, arguing that in Massachusetts an assignment of rents is not separate from a mortgagee's interest in the real property. In light of our disposition of the case, we need not resolve this question.  -20- 20