Marie T. PICCHI, Debtor.

Pawtucket Credit Union, Appellant,

v.

Marie T. Picchi, Appellee.

BAP No. RI 10–055.
Bankruptcy No. 10–11020–ANV.

United States Bankruptcy Appellate Panel
of the First Circuit.

April 11, 2011.

John T. Gannon, Esq., and John I. Donovan, Esq., Pawtucket, RI, on brief, for Appellant.

John S. Simonian, Esq., on brief for Appellee.

Before DE JESÚS, KORNREICH, and TESTER, United States Bankruptcy Appellate Panel Judges.

KORNREICH, Bankruptcy Judge.

Marie T. Picchi ("Picchi") is the debtor in this chapter 13 case from the District of Rhode Island. Pawtucket Credit Union ("Pawtucket") is the holder of a claim secured by a second mortgage against Picchi's two-family home. Picchi's plan, which modifies Pawtucket's rights as a mortgagee, was confirmed by the bankruptcy court over Pawtucket's objection. On appeal Pawtucket argues that the bankruptcy court erred in concluding that § 1322(b)(2) permits a debtor to modify the rights of a mortgagee in a two-family home.[1] For the reasons expressed below, we **AFFIRM**.

## BACKGROUND

Picchi filed a chapter 13 petition in March 2010. Her schedules show her to be the owner of a two-family home (the "property") valued at $125,000.00. She resides in one unit and rents out the second unit. Picchi's schedules also show the property to be subject to a first mortgage in favor of Navigant Credit Union in the amount of $134,928.00, a second mortgage in favor of Pawtucket in the amount of $87,032.00, and a third mortgage in favor of Beneficial Mortgage Co. of Rhode Island ("Beneficial") in the amount of $16,382.00.

Picchi's plan reduced the value of Pawtucket's secured claim to zero because, at $125,000.00, the value of the property would have been consumed totally by the senior secured claim.[2] Pawtucket objected to its treatment under the plan, arguing that Picchi had undervalued the property and that the anti-modification clause in § 1322(b)(2) prohibited Picchi from modifying its rights.[3] Pawtucket argued that

---

[1] Unless expressly stated otherwise, all references to "Code" or to specific statutory sections shall be to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, 119 Stat. 23, 11 U.S.C. §§ 101, *et seq.*

[2] Beneficial's claim was given the same treatment under Picchi's plan.

[3] Pawtucket asserted the actual value to be $157,000.00 At the confirmation hearing, the parties settled on a value of $141,000.00 This

the rule permitting modification of a mortgagee's rights in a multi-unit dwelling, *see Lomas Mortgage, Inc. v. Louis,* 82 F.3d 1 (1st Cir.1996), has been abrogated by the definitions of "debtor's principal residence" and "incidental property" introduced into the Code by BAPCPA. Specifically, Pawtucket urged the bankruptcy court to conclude that its claim was secured solely by Picchi's "principal residence" and that the second unit in the two-family home was simply "incidental property." The bankruptcy judge rejected this notion and overruled Pawtucket's objection based upon his own decision in *In re French,* 174 B.R. 1 (Bankr.D.Mass.1994).[4] An order confirming the plan was entered. This appeal followed.

On December 22, 2010, after the briefs were filed, the Bankruptcy Technical Corrections Act of 2010 ("BTCA") became law without any express statement of temporal scope. *See* Pub.L. 111–327, 124 Stat. 3557 (Dec. 22, 2010). Although the legislative history provides that BTCA was "not intended to enact any substantive change to the Bankruptcy Code," *see* 156 CONG. REC. H7158 (daily ed. Sept. 28, 2010) (statement of Rep. Smith), there is no clear statement in the record on whether it was intended to have prospective or retroactive applicability. Among other things, BTCA amends § 101(13A) of the Code which defines debtor's principal residence.[5] The legislative record indicates that "[this] amendment clarifies that the definition pertains to a structure used by the debtor as a principal residence." *See* 156 CONG. REC. H7158 (daily ed. Sept. 28, 2010). Despite the centrality of the meaning of "debtor's principal residence" to the outcome of this case, neither party has asked us (a) to determine whether the revised definition contained in BTCA should apply in this case; or (b) to remand this case for such a determination in the bankruptcy court. Therefore, our review of the bankruptcy court's decision will be based upon the law as it was at the time of that decision.

### JURISDICTION

 We have jurisdiction to hear appeals from final judgments, orders and decrees and, subject to our discretion, from certain interlocutory orders. 28 U.S.C. § 158(a); *Fleet Data Processing Corp. v. Branch (In re Bank of New England Corp.),* 218 B.R. 643, 645 (1st Cir. BAP 1998). A decision is considered final if it "ends the litigation on the merits and leaves nothing for the court to do but

---

value left Pawtucket with a small secured claim.

4. In *In re French,* the bankruptcy court stated: In order to properly analyze the effect of "additional collateral" on the anti-modification provisions of § 1322(b)(2), this Court believes that the test should be whether or not the "additional collateral" set forth in the subject mortgage is nothing more than an enhancement which is or can, by agreement of the parties, be made a component part of the real property or is of little or no independent value. The existence of collateral which is nothing more than such an enhancement should not result in a forfeiture by the lender of the anti-modification provisions of § 1322(b)(2).

174 B.R. at 7.

5. Section 101(13A) now provides:

The term 'debtor's principal residence'—(A) means a residential structure *if used as the principal residence by the debtor,* including incidental property, without regard to whether that structure is attached to real property; and (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer *if used as the principal residence by the debtor.* 11 U.S.C. § 101(13A) (as amended by the Bankruptcy Technical Corrections Act of 2010, Pub.L. 111–327, 124 Stat. 3557 (Dec. 22, 2010) (emphasis supplied to show the amendments)).

execute the judgment." *Id.* at 646 (citations omitted). The bankruptcy court's decision to modify Pawtucket's claim under § 1322(b)(2) is a final order. *See E. Sav. Bank, FSB v. LaFata (In re LaFata),* 483 F.3d 13, 18 (1st Cir.2007); *Carvalho v. Fed. Nat'l Mortgage Ass'n (In re Carvalho),* 335 F.3d 45, 49 (1st Cir.2003) (holding that an order confirming a plan is customarily *res judicata* to all issues that were or could have been decided during the confirmation process).

### STANDARD OF REVIEW

The facts in this case are not in dispute. We will apply *de novo* review to the legal issues presented in this appeal. *See Lessard v. Wilton–Lyndeborough Coop. School Dist.,* 592 F.3d 267, 269 (1st Cir. 2010); *Antognoni v. Basso (In re Basso),* 397 B.R. 556, 562 (1st Cir. BAP 2008).

### DISCUSSION

The bankruptcy court did not err in permitting the modification of Pawtucket's secured claim and confirming Picchi's plan. These actions were in accord with the principle of claim bifurcation, codified in § 506(a)[6] and did not violate the anti-modification clause contained within § 1322(b)(2). Moreover, with respect to Pawtucket's specific concerns, the definitions of "debtor's principal residence" and "incidental property" introduced by BAPCPA did not alter the scope of the anti-modification clause.

The bifurcation process separates an under-secured claim into two parts: a secured claim pegged at the value of the collateral and an unsecured claim for the difference between the value of the debt and the value of the collateral. In chapter 13, as in other chapter proceedings, bifurcation may be forced upon a secured party by a plan proponent. However, this process, known as "strip down" or "cram down," is barred by § 1322(b)(2) where the claim is "secured only by a lien on the debtor's principle residence." *Nobelman v. American Sav. Bank,* 508 U.S. 324, 332, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). But, in deciding *Nobelman,* the Supreme Court did not address when a claim is secured *only* by a security interest in real property that is the debtor's principle residence.

■ The anti-modification clause within § 1322(b)(2) is ambiguous.[7] It could be understood (1) to bar bifurcation of a claim secured by a security interest in real property that *includes* the debtor's principal residence, or (2) to bar bifurcation of a claim secured by a security interest in real property that is *exclusively* the debtor's principal residence. The first understanding, preferred by the mortgage industry, would bar bifurcation of a claim secured by a mortgage on a multi-unit dwelling. The second, preferred by debtors, would allow it.

---

**6.** Section 506(a) provides, in relevant part:
An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … and is an unsecured claim to the extent that the value of such creditor's interest … is less than the amount of such allowed claim. 11 U.S.C. § 506(a)(1).

**7.** Section 1322 provides in relevant part:

(b) Subject to subsections (a) and (c) of this section, the plan may—… (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims … 11 U.S.C. § 1322(b)(2) (emphasis supplied.). Subsections (a) and (c) are not implicated in this case.

The U.S. Court of Appeals for the First Circuit discussed this ambiguity in 1996, two years after *Nobelman*, in a case with facts resembling those presented here. *See Lomas*, 82 F.3d at 3–4. Finding the contemporaneous legislative history to be inconclusive on the meaning of § 1322(b)(2), *id.* at 4–6, the First Circuit looked to the legislative history behind an identical anti-modification clause Congress added to chapter 11 as part of the Bankruptcy Reform Act of 1994. *Id.* at 6. The First Circuit observed: (1) that this new clause, codified at § 1123(b)(5), was intended by Congress to conform the treatment of residential mortgages in chapter 11 to that of chapter 13; and (2) that Congress understood, post-*Nobelman*, that § 1123(b)(5) would mimic its older chapter 13 sibling by permitting the strip down of a claim secured by a multi-unit dwelling.[8] *Id.* at 6–7. The First Circuit then held "that the antimodification provision of § 1322(b)(2) does not bar modification of a secured claim on a multi-unit property in which one of the units is the debtor's principal residence and the security interest extends to the other income-producing units." *Id.* at 7.[9]

Pawtucket argues that the holding in *Lomas* has been abrogated by the definitions of "debtor's personal residence" and "incidental property" introduced by BAPCPA. Pawtucket's argument has two prongs: first, that the language of each definition is clear and unambiguous; and, second, that when these definitions are combined and inserted within § 1322(b)(2) they remove the ambiguity underlying the holding in *Lomas*. We are not convinced.

■ Pawtucket takes the plain meaning of the term "residential structure," appearing in the definition of "debtor's principal residence," to include both a single family home and a multi-unit dwelling. *See* 11 U.S.C. § 101(13A).[10] If "residential structure" appeared as a stand alone term, Pawtucket would be correct. But in the context of § 101(13A), "residential structure" appears in subparagraph (A), which is qualified by subparagraph (B). Subparagraph (B) includes within the meaning of "debtor's principal residence," such living units as "an individual condominium or cooperative unit, a mobile or manufactured

---

**8.** This determination was based upon the portion of the legislative record referring to *In re Ramirez*, 62 B.R. 668 (Bankr.S.D.Cal.1986), "as an example of a case in which the antimodification provision of Chapter 11 would not apply." *Lomas*, 82 F.3d at 6–7 (citing the Judiciary Committee Report, H.R. Report No. 835 at 46, n. 13). In *Ramirez*, the bankruptcy court held that § 1322(b)(2) permits modification of a claim secured by a mortgage on real property that includes the debtor's principal residence and generates rental income. 62 B.R. at 670. Additionally, the First Circuit offered the following policy reason for its decision:

> ... extending the antimodification provision to multi-family houses would ... create a difficult line-drawing problem. It is unlikely that Congress intended the antimodification provision to reach a 100–unit apartment complex simply because the debtor lives in one of the units. Limiting the antimodification provision to single-family dwellings creates a more easily administered test.

*Lomas*, 82 F.3d at 6.

**9.** Other courts have reached the same conclusion based upon the plain meaning of § 1322(b)(2). *See, e.g., Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough),* 461 F.3d 406, 411 (3d Cir.2006).

**10.** The pre-BTCA version of § 101(13A) states:

> The term 'debtor's principal residence'—
> (A) means a residential structure, including incidental property, without regard to whether that structure is attached to real property; and
> (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer.

home, or trailer." The combination of subparagraphs (A) and (B) suggests that the term "residential structure" may refer to the space encompassing the debtor's actual living unit.

 Similarly, Pawtucket understands the plain meaning of the phrase "including property commonly conveyed with a principal residence in the area where the real property is located," taken from the definition of "incidental property," *see* 11 U.S.C. § 101(27B),[11] to include a rental unit within a multi-unit dwelling in Picchi's locale. This reading of "incidental property" is plausible; but we are more impressed with the bankruptcy court's reckoning that "incidental property" means objects like a "boiler, the attached garage, [or] the window treatments that are typically listed in a standard mortgage."

Thus we are not inclined to agree that the definitions of "debtor's principal residence" and "incidental property" are clear and unambiguous. More importantly, we reject the suggestion that these definitions, when combined and inserted into § 1322(b)(2), cure the ambiguity in the anti-modification clause.

The anti-modification clause, including the definitions suggested by Pawtucket, would look like this:

> [T]he plan may modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is *a residential structure, including property commonly conveyed with a principal residence in the area where the real property is located, all easements, rights, appurtenances, fixtures, rents, royalties, mineral rights, oil and gas rights or profits, water rights, escrow funds or insurance proceeds, and all replacements or additions, without regard to whether that structure is attached to real property including an individual condominium or cooperative unit, a mobile or manufactured home, or trailer. . . .*

This enhanced clause does not remove the question of whether the statute bars bifurcation of a claim secured by a security interest in a multi-unit dwelling that includes the debtor's principal residence.

### *CONCLUSION*

 The meaning and scope of § 1322(b)(2) have not been altered by the definitions of "debtor's principal residence" and "incidental property" introduced by BAPCPA.[12] For the reasons given long ago in *Lomas*, § 1322(b)(2) does not bar bifurcation of a claim secured by a multi-unit dwelling. Consequently, we **AFFIRM.**

---

**11.** Section 101(27B) provides:
The term 'incidental property' means, with respect to a debtor's principal residence—
(A) property commonly conveyed with a principle residence in the area where the real property is located;
(B) all easements, rights, appurtenances, fixtures, rents, royalties, mineral rights, oil or gas rights or profits, water rights, escrow funds, or insurance proceeds; and

(C) all replacements or additions.
11 U.S.C. § 101(27B).

**12.** Due to the failure of the parties to raise the question, we offer no comment on whether the same result would pertain under the revised definition of "debtor's principal residence" contained in BTCA.