In re Clayton H. WAGES and Andrea
S. Wages, Debtors.

No. 11–40249–JDP.

United States Bankruptcy Court,
D. Idaho.

July 24, 2012.

Brent Robinson, Robinson, Anthon & Tribe, Rupert, ID, for Debtor.

Brian Langford, Routh Crabtree Olsen, P.S., Boise, ID, for JPMorgan Chase Bank.

Mary Kimmel, Boise, ID, Office of the U.S. Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### Introduction

Chapter 11[1] debtors Clayton and Andrea Wages ("Debtors") reside in a house situated on approximately 11 acres (the "Property") near Heyburn. They also use the Property in the operation of their trucking business. Debtors have proposed a chapter 11 plan in which they modify the terms of a mortgage on the Property held by JPMorgan Chase Bank, N.A. ("Creditor"). Creditor objects to confirmation of Debtors' plan, asserting that, per §§ 1129(a)(1) and 1123(b)(5), Debtors may not modify Creditor's contract rights because its claim is secured solely by an interest in property that Debtors use as their principal residence. Debtors, for their part, argue that, because they also operate a business on the Property, Creditor's claim is not secured by real property used solely as their residence, and, therefore, § 1123(b)(5) is inapplicable.

After a June 12, 2012, hearing, the Court took Creditor's objection to confirmation of Debtors' plan under advisement. This Memorandum sets forth the Court's findings of fact and conclusions of law concerning this contest. Rule 7052, 9014.

### Facts[2]

Debtors purchased the Property in 1999. Initially, they used approximately four acres for raising feed or crops, five acres for pasturing livestock, and two acres for residential purposes. At that time, Debtors' employment consisted of raising roping stock on the Property to rent out for rodeos and roping events. About a year later, Debtors purchased a truck to haul their livestock, and income from use of their truck became a component of their business income.

Between 2004 and 2006, Debtors sold all of their livestock to raise money to stave off a foreclosure against the Property. Since then, Debtors have not used the Property at all to generate income from livestock; they allow a neighbor to pasture animals on the Property free of charge.

At some time,[3] Debtors leased an additional truck and began hauling commodi-

---

**1.** Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

**2.** These facts are derived from the parties' submissions and Andrea Wages' June 12 testimony.

**3.** The record is not clear as to exactly when Debtors transformed their business into a trucking-only operation.

ties for others. Their former livestock/trucking business became a trucking-only business (the "Business"). Mr. Wages drives one of the trucks; Mrs. Wages secures permits, keeps the books for the Business, and handles other administrative chores from an office in Debtors' home. When they are not being used on the road,[4] Debtors park the two trucks and trailers[5] on the Property. Also, when needed, Debtors repair the trucks and trailers on the Property. Thus, when Debtors filed their chapter 11 bankruptcy petition on March 4, 2011, Debtors were using a portion of the Property to operate the Business, including a small office in the house, and enough adjoining space to park two truck tractors and up to three trailers.

In May 2011, Creditor filed a $127,418.31 secured claim in Debtors' bankruptcy case based on a mortgage debt. Exh. 201. Per the mortgage note's terms, Debtors agreed to make monthly payments through April 1, 2029, at an annual interest rate of 7.5%. *Id.* The debt was secured by a mortgage on the Property. *Id.*

Debtors filed a chapter 11 plan in November 2011 (the "Plan"). Dkt. No. 50. Under the Plan, Debtors propose to modify the terms of Creditor's mortgage by reducing the interest rate to 5.0% per year, and extending the payoff date to March 1, 2032. *Id.* Creditor objected to confirmation of the Plan, arguing that it does not meet the confirmation requirements of §§ 1129(a)(1) and 1123(b)(5). Debtors assert that they have met the Code's confirmation requirements.[6]

### Discussion of Applicable Law

■ The Court may not confirm a chapter 11 plan unless it satisfies the Code's requirements. In particular, Debtors must show that their plan "complies with the applicable provisions of this title." § 1129(a)(1).[7] Among the Code's provisions applicable to chapter 11 plans is § 1123(b)(5), which provides that a plan may

> modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence,* or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

(emphasis added). The upshot of this provision is that, if a creditor's claim is secured only by a security interest in real property that is the debtor's principal residence, the plan may not modify the creditor's rights. § 1123(b)(5). The meaning of

---

4. For example, Mr. Wages has been working a truck driving job in Nevada for the last ten months.

5. Debtors' exhibits include an application for a U.S. DOT number indicating that Debtors owned a truck tractor, leased a truck tractor, and leased two trailers when applying for that number, which, as near as the Court can tell, was sometime prior to March of 2002. Exh. 112. When Debtors filed their schedules in the bankruptcy case in 2011, they indicated that they owned one truck tractor, a livestock trailer, and a flatbed trailer, and leased another trailer. Dkt. No. 20. At the June 12 hearing, Debtors testified that a friend had given them another truck, and Debtors' exhibits include a picture of a truck tractor with "Leased To Wages Livestock" painted on the side above Debtors' U.S. DOT number. Exh. 104. It thus appears that the Business utilizes two truck tractors and up to three trailers.

6. But for resolution of Creditor's objection, the Plan appears to satisfy all other requirements for confirmation under § 1129(b).

7. Section 1129(a)(1) provides:
   (a) The court shall confirm a plan only if all of the following requirements are met:
   (1) The plan complies with the applicable provisions of this title.

this provision is the focus of the parties' arguments in this case.

In interpreting the Code, the Court first looks to the statute's plain meaning. *See Beach v. Bank of Am. (In re Beach),* 447 B.R. 313, 321 (Bankr.D.Idaho 2011) (citing *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.,* 627 F.3d 1268, 1270 (9th Cir.2010)). If the language at issue has a plain and unambiguous meaning, and the disposition required by the text is not absurd, the Court's inquiry ends. *Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)); *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). The Court must review the entire statute in context, not viewing individual words in isolation. *Reswick v. Reswick (In re Reswick),* 446 B.R. 362, 370–71 (9th Cir. BAP 2011).

Here, looking at the Code as a whole, the phrase " 'secured only by a security interest in real property that is the debtor's principal residence' modifies [the word] 'claim' and describes the type of claim that is excepted from modification." *BAC Home Loans Servicing, LP v. Abdelgadir (In re Abdelgadir),* 455 B.R. 896, 903 (9th Cir. BAP 2011). As parsed by one bankruptcy court, the claims excepted from modification under § 1123(b)(5) are those (1) secured only by a parcel of real estate which (2) the debtor uses for his principal residence. *In re Macaluso,* 254 B.R. 799, 800 (Bankr.W.D.N.Y.2000) (finding the language of the Code's anti-modification provision[8] to be "[u]nambiguous and clear," and indicating that "the statute does not limit its application to property that is used *only* as a principal residence, but refers generally to any parcel of real property that the debtor uses for that purpose." (emphasis in original)). In other words, the analysis to be employed by the Court to determine whether a claim is protected from plan modification under § 1123(b)(5) is clearly identified in the Code's plain language: the bankruptcy court must first determine whether a claim is secured only by a parcel of real property; if it is, the court must then determine if that property is the debtor's principal residence; and, if it is, the debtor may not modify the claim secured by that property.

There is another view held by some courts about how to construe § 1123(b)(5), though. These courts focus on the particular words in the statute, and, in this Court's view, have seemingly convoluted the interpretation of the anti-modification provision. These courts deem the terms "real property" and "debtor's principal residence" to be coterminous, which, they argue, limits the provision's protection to those claims secured by property used *only* as a debtor's principal residence. *See, e.g., Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough),* 461 F.3d 406, 411 (3d Cir.2006) (focusing on Congress' use of the word "is" in the phrase "real property that is the debtor's principal residence," and finding that, by using "is," Congress equated "real property" and "principal residence," meaning that, for the anti-modification provision to

---

**8.** Much of the case law construes the Code's chapter 13 anti-modification provision, § 1322(b)(2), and not § 1123(b)(5). But, since those sections contain the same statutory language, the Court considers the decisions interpreting either provision as persuasive in interpreting the other. *See, e.g., Benafel v. One W. Bank, FSB (In re Benafel),* 461 B.R. 581, 586–87 (9th Cir. BAP 2011).

apply, the property "must *be only* the debtor's principal residence" and have no other use (emphasis in original)); *Adebanjo v. Dime Sav. Bank of N.Y., FSB (In re Adebanjo)*, 165 B.R. 98, 103–04 (Bankr. D.Conn.1994) (same).

Despite these other decisions, the Court does not consider the different terms used in § 1123(b)(5) to be equivalent. Under the Code, "debtor's principal residence":

> (A) means a residential structure if used as the principal residence by the debtor, including incidental property, *without regard to whether that structure is attached to real property;* and

> (B) includes an individual condominium or cooperative unit, a mobile or manufactured home, or trailer if used as the principal residence by the debtor.

§ 101(13A) (emphasis added). This statutory definition, which refers to a "structure," regardless of the presence of, or the structure's attachment to, real property, obviously contemplates situations where a debtor's principal residence is not the equivalent of "real property." *See id.*

■ In addition, a hyperliteral interpretation of § 1123(b)(5) equating "real property" with a "debtor's principal residence" could lead to absurd results when applied. If the Code's anti-modification provision's protections extend solely to claims secured by the *structure* a debtor uses as his or her principal residence (*i.e.,* the house), the provision would have no application to most residential mortgage loans, which are

typically secured not only by a residential structure, but also by the real property on which the structure sits. Of course, the Supreme Court has recently reminded bankruptcy courts to eschew hyperliteral translations of the Code when the process yields results contrary to common sense. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* —— U.S. ——, 132 S.Ct. 2065, 2068, 182 L.Ed.2d 967 (2012).

■ The Court concludes it a more sensible interpretation to extend the protections of § 1123(b)(5) to any loan secured only by real property that the debtor uses as a principal residence.[9] While most courts reviewing the anti-modification provision have adopted this more reasonable interpretation, many have had difficulty applying the provision when a property has multiple uses. In such cases, several courts, including some in the Ninth Circuit, have added non-textual requirements to the equation, finding that, if a property had "significant actual commercial use" or "inherent income producing potential," a claim secured by the property may be modified. *See In re McVay,* 150 B.R. 254, 256–57 (Bankr.D.Or.1993). *See also Lievsay v. W. Fin. Sav. Bank, F.S.B. (In re Lievsay),* 199 B.R. 705, 709 (9th Cir. BAP 1996) (because the debtor did not show that a home office added significant value to his property, or that the bank relied on the additional security offered by his home office in making the loan secured by the property,[10] the panel declined to decide

9. This reading is consistent with the plain and ordinary meaning of the phrase "real property that is the debtor's principal residence," and does not focus on individual words in isolation.

10. It is now questionable whether, in the Ninth Circuit, a lender's reliance on any of a debtor's property as security at the time of making a loan should be considered in interpreting the Code's anti-modification provi-

sions. The point at which a property's use is assessed for purposes of applying the §§ 1123(b)(5) and 1322(b)(2) anti-modification provisions is the *petition date,* not the loan origination date. *See In re Abdelgadir,* 455 B.R. at 903 (finding that the petition date is the appropriate time to determine a debtor's principal residence under § 1123(b)(5)); *and In re Benafel,* 461 B.R. at 588 (finding that, under § 1322(b)(2), the petition date is when a debtor's principal residence is deter-

whether the home office provided additional security that would allow the debtor to modify his loan); *In re Ramirez*, 62 B.R. 668, 669–70 (Bankr.S.D.Cal.1986) (determining that, because the debtor's property generated income as a rental property, in addition to being the debtor's residence, the mortgage on the property was modifiable).

Inherent in this approach to construing the Code is the courts' assumption that, at some point, for multi-use properties, the intensity of a commercial use may somehow transition a property from the debtor's principal residence, to something other than his or her principal residence. The Code, however, explicitly provides modification protection to claims secured only by an interest in real property that is the debtor's principal residence. § 1123(b)(5). It does not protect from modification "claim[s] secured only by a security interest in real property that is *exclusively* the debtor's principal residence," or "claim[s] secured only by a security interest in real property that is the debtor's principal residence, *unless the debtor also uses the property for significant commercial purposes.*" Indeed, there is nothing in the Code indicating that, once a commercial use of a property becomes sufficiently "significant," that property ceases being the debtor's principal residence.

Simply put, either a property is a debtor's principal residence or it is not; the existence of other uses on the property does not change that. *See also In re Macaluso*, 254 B.R. at 800 ("So long as the only collateral is a single parcel of real estate, it matters not that that parcel may fulfill many uses or be divided into many units. The statutory requirements are fulfilled whenever the debtor principally resides in that real estate or some part thereof.").

Additionally, relying on bankruptcy courts across the country to make case-by-case determinations as to whether a particular mixed use property crosses some undefined threshold from a "principal residence" to some other type of use is likely unworkable. The Code provides no indication of where an appropriate line between "principal residence" and "commercial activity" would be. For example, in this case, would Creditor's loan be protected from modification by § 1123(b)(5) if they parked four trucks on the Property?; five?; if they used 23% of the Property for commercial purposes, but not 24%? Some decisions have attempted to establish factors to identify when, for these purposes, a property is no longer solely a debtor's principal residence. *See, e.g., In re Brunson*, 201 B.R. 351 (Bankr.W.D.N.Y.1996) (developing a list of factors[11] to use in case-by-case determinations of whether a

---

mined). Whether the creditor assumed that a loan would be secured by property that was used solely as the debtor's principal residence at the inception of the transaction is, for bankruptcy plan claim modification purposes, irrelevant.

**11.** *In re Brunson* suggests that, in each multi-use case, the bankruptcy court should consider:

whether the Debtor (to the lender's knowledge) owned other income producing properties or other properties in which she could choose to reside; whether she had a[nother] principal occupation . . ., and the extent to which rental income or other busi-

ness income produced from the real estate contributed to her income; whether her total income was particularly high or particularly low; whether the mortgage was handled through the commercial loan department or the residential mortgage loan department of the lender; whether the interest rates applied to the mortgage were home loan rates or commercial loan rates; the demographics of the market . . .; and the extent to which, and purpose for which, potential business uses of the land (such as farming) were considered by the lender. There surely may be others.

201 B.R. at 353.

property is commercial or the debtor's principal residence). Of course, the only standard identified in the Code is whether the property is the debtor's principal residence. Restricting the application of the Code's anti-modification provision to a bright-line determination of whether, as a matter of fact, a claim is secured by property used by a debtor as his principal residence provides the sort of objective standard necessary for consistent judicial decisions and stable credit markets. As noted by one bankruptcy court:

> Markets work best when there are clear rules consistently applied. Although investors certainly value fairness, they place an even higher value on certainty. Investors can adjust for inequities. It is much harder to adjust for uncertainty. Deciding whether a particular mortgage falls within the home mortgage exception perhaps years after the fact on a case-by-case basis may ensure an equitable result for the particular debtor and lender involved. However, the home mortgage lending market as a whole pays a price for this result because of the considerable uncertainty such an approach lends to the underwriting decision when home loans are made.

*In re Bulson,* 327 B.R. 830, 842 (Bankr. W.D.Mich.2005). A clear demarcation also allows chapter 11 debtors and their lawyers to more clearly measure their ability to modify creditor rights even before filing for bankruptcy, and certainly during the case in negotiating a plan.

Of course, there are some courts which, while recognizing the importance of a bright-line standard, have attempted to place the line elsewhere. In those cases, modification protection is denied whenever a debtor uses his property for something other than as his principal residence only. *See, e.g., In re Kimbell,* 247 B.R. 35, 37–38

(Bankr.W.D.N.Y.2000). For several reasons, the Court is not persuaded.

First, the secondary use considered in those decisions has usually been multifamily housing, or, in other words, where a debtor attempts to modify the mortgage on a multi-unit dwelling while living in one of those units. *See, e.g., Lomas Mortg., Inc. v. Louis,* 82 F.3d 1 (1st Cir.1996); *Ford Consumer Fin. Co., Inc. v. Maddaloni (In re Maddaloni),* 225 B.R. 277 (D.Conn.1998); *In re Kimbell,* 247 B.R. 35. Here, besides using the Property as their residence, Debtors use it for their trucking business. Clearly, the anti-modification provision's practical and policy considerations as applied to multi-family dwellings are not the same as those applicable to a trucking business.

■ Second, these courts rely primarily on policy grounds and legislative history, rather than conducting an analysis of the Code's language. *See, e.g., In re Kimbell,* 247 B.R. at 37–38; *In re Maddaloni,* 225 B.R. at 279–80. *See also Lomas Mortg., Inc.,* 82 F.3d at 3–4 (comparing the two positions presented by the parties and finding that, merely because the parties disagreed as to the statute's meaning, the "plain meaning" approach must be inconclusive and a resort to legislative history was required). Here, the Court concludes there is no need to resort to legislative history, particularly not at the expense of the Code's language, because, in the Court's opinion, the language of § 1123(b)(5) is plain and the disposition required by the text is not absurd. *See Milavetz, Gallop & Milavetz, P.A. v. United States,* —— U.S. ——, 130 S.Ct. 1324, 1332 n. 3, 176 L.Ed.2d 79 (2010) (resort to legislative history is unnecessary where a statute's language is unambiguous); *Lamie,* 540 U.S. at 534, 536, 124 S.Ct. 1023. A Code provision is not rendered ambiguous merely because courts disagree as to

its meaning. *In re Reswick,* 446 B.R. at 370.

■ To be sure, adoption of a bright-line rule could conceivably produce anomalous results. For example, the bankruptcy court in *In re Bulson* observed that the interpretation adopted here by the Court would "allow[ ] within its scope any integral plot of land, however described or platted, upon which is situated any structure used by the debtor as his principal residence. The real property could be a city lot, three city lots, a quarter acre suburban lot, a five acre suburban lot, or a 500–acre farm. As for the debtor's dwelling on the property, it could be a hut, an affixed mobile home, a 10,000 square foot mansion, one room in a duplex, one apartment in a 4–unit apartment, or one apartment in a 100–unit apartment. How the remaining property and the other structures located on the property were being used or could be used would be irrelevant." 327 B.R. at 842–43. But the potential for harsh results can not be used as an excuse by the Court to torture the Code's language to reach a different rule in this case. Even if the Court does not agree with all of the possible outcomes produced by the statutory language, it is Congress, not this Court, that must repair any problems with the Code. *See Lamie,* 540 U.S. at 538, 541, 124 S.Ct. 1023 ("Our unwillingness to soften the import of Congress' chosen words even if we believe the words lead to a harsh outcome is longstanding. It results from deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill.... If Congress enacted into law something different from what it

intended, then it should amend the statute to conform it to its intent. It is beyond our province to rescue Congress from its drafting errors, and to provide for what we might think ... is the preferred result." (internal quotations and citations omitted)).

At the same time, this is not to say that the Court may *never* look beyond § 1123(b)(5)'s plain language to review the impact of its legislative history in all cases. The Court simply refuses to do so until presented with facts where the disposition required by the plain text is absurd.[12] *See id.* at 534, 124 S.Ct. 1023. *But see, e.g., Lomas Mortg., Inc.,* 82 F.3d at 6 (looking beyond § 1123(b)(5)'s plain text on the basis of a mere hypothetical, and finding that, whenever a non-principal-residence use occurs on property, a claim may be modified because "[i]t is unlikely that Congress intended the antimodification provision to reach a 100–unit apartment complex simply because the debtor lives in one of the units."). While application of § 1123(b)(5), as construed by the Court here, may approach absurdity in a case where the debtor's sole asset is a large farm property on which the debtor resides, this is certainly not that case.

At bottom, whatever meaning the Court ascribes to § 1123(b)(5), the resulting definition would, potentially, be both over-inclusive and under-inclusive. *See In re Bulson,* 327 B.R. at 842–43 (identifying interpretations that are the "limits for an almost limitless number of variations" of potential interpretations of § 1123(b)(5)'s language). If the mortgage on property where a debtor both conducts some busi-

**12.** It is likely that several of the results identified by *In re Bulson,* 327, B.R. at 842–43, as falling within the scope of the plain reading adopted by the Court may be sufficiently absurd to require the Court to look beyond the statute's plain language if the text, as applied

in a particular case, were to require such a disposition, *e.g.,* limiting modification where the property includes a residence on a large farm, or where the debtor's residence is one apartment in a 100–unit complex, etc.

ness and lives can be modified, the intent of Congress expressed in the Code will be subordinated to an unpredictable "case-by-case" application of § 1123(b)(5). By the same token, a debtor who secures a loan with business property, on which he also happens to reside when he or she files a chapter 11 bankruptcy petition to reorganize the business, will likely feel frustrated by this Court's decision that the mortgage can not be restructured through a plan. On the other hand, even applying this Court's construction of § 1123(b)(5), under *In re Abdelgadir*, the debtor has the option of relocating his or her residence prior to filing the bankruptcy petition.[13] *See* 455 B.R. at 903 (establishing the petition date as the appropriate time to determine a debtor's principal residence under § 1123(b)(5)).

### Disposition

■ Because, in this case, the disposition required by the text of the Code is not absurd, the Court is duty-bound to apply § 1123(b)(5) according to its plain terms. Here, the only security for Creditor's claim is the Property. There is no dispute that Debtors live on the Property, and that it is their principal residence. That Debtors also operate a business on the Property does not change that. Creditor's mortgage terms may not be modified in this case and preventing Debtors from modifying their mortgage under § 1123(b)(5) is not an absurd result. The Court therefore concludes that Debtors' Plan does not satisfy § 1129(a)(1) because it violates an applicable provision of the Code,

§ 1123(b)(5). As a result, the Plan can not be confirmed.

### Conclusion

Creditor's objection to confirmation of Debtors' proposed chapter 11 plan is sustained. A separate order denying confirmation of Debtors' plan will be entered.

---

**13.** This option highlights the impact of Congress' decision to tie a debtor's right to modify the rights of mortgage creditors to those that hold "claims," as identified in *In re Abdelgadir*, 455 B.R. at 903. In other words, a debtor may control his ability to modify a mortgage claim merely by how he or she uses the property when the status of claims in a bankruptcy case are determined, the petition date. *Id.* While this may prevent a debtor

from modifying a claim that was made as a commercial loan if the debtor happens to live on the property on the petition date, it also allows a debtor to use § 1123(b)(5) to modify a residential mortgage claim as long as the debtor is not living on the property on the petition date, *e.g.*, if the debtor is renting the home to others, or is only operating a business from, and not living in, the home.